**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------

| | |
|---|---|
| RARITAN BAYKEEPER, INC. (d/b/a NY/NJ BAYKEEPER), <br><br>        Plaintiff, <br><br> v. <br><br> STILLWELL READY MIX & BUILDING MATERIALS, LLC; STILLWELL READY MIX, LLC; and GERARD GARGANO, <br><br>        Defendants. | Case No. 21-cv-5265 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

------------------------------------------------------------

Plaintiff RARITAN BAYKEEPER, INC. ("Baykeeper"), doing business as "NY/NJ Baykeeper," by and through its counsel, hereby alleges:

**I.**

**INTRODUCTION**

1.     This action is brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"), to address and abate Defendants' ongoing and continuous violations of the Act.

2.     Defendants discharge process wastewater and polluted industrial stormwater from a ready-mix concrete facility located at 2608 West 13th Street in Brooklyn, New York (Block 7225; Lots 1, 4, 6, 8, 9) (the "Facility") into Coney Island Creek in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation ("DEC") SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit").

1

3.      Coney Island Creek is an "impaired" waterbody.  Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  New York State has determined that Coney Island Creek fails to meet state water quality standards for dissolved oxygen, fecal coliform, and garbage/refuse.

4.      Defendants' stormwater discharges and discharges of process wastewater contribute to the pollution problem in Coney Island Creek.  Defendants engage in industrial activities such as manufacturing, loading, and delivering ready-mix concrete.  These activities are conducted mostly outdoors, where they generate pollution that is exposed to stormwater. This includes a great deal of dust and cement particles that accumulate outdoors on Defendants' property, blow off Defendants' property, or are generated through industrial activities that Defendants conduct on city streets, such as unloading cement deliveries from trucks parked in the street.  In addition, Defendants engage in truck washing in areas that discharge to New York City's municipal stormwater drainage system, contributing polluted process wastewater to stormwater flows into Coney Island Creek.

5.      The pollutants discharged in stormwater and wastewater from Defendants' industrial activities include solids that suspend or dissolve in water; lead, iron, zinc, and other metals; detergents and other cleaning agents; fuel, fuel additives, lubricants, oil, and grease; oxygen-depleting substances; and pH-altering substances.  Contaminated discharges such as those from the Facility can and must be controlled to the fullest extent required by law to allow Coney Island Creek a fighting chance to regain its health.

6.      Defendants have a long history of violating water pollution laws at the Facility. In 2007, The City of New York's Environmental Control Board found that operations at the

Facility violated prohibitions on discharges of industrial waste materials to public sewers.  In 2008, a New York State DEC inspection found violations of a stormwater pollution permit that preceded the General Permit and inadequate pollution control measures at the Facility.  In 2016, DEC issued a Notice of Violation to Defendants for discharging concrete laden industrial wastewater to Coney Island Creek without a permit.  In 2017, DEC denied a request from Defendants to waive the requirement to obtain coverage under a stormwater pollution permit.  Defendants did not obtain a permit however, and in 2018 Baykeeper sued defendants in the Eastern District of New York for violating the Clean Water Act by discharging polluted stormwater and wastewater without a permit.  In 2019, Baykeeper and Defendants settled that lawsuit based on Defendants' promises: to obtain coverage under the General Permit; to comply with the General Permit's terms; to stop discharging wastewater from truck washing operations; and to make certain improvements at the Facility that would reduce stormwater pollution.

7.      Throughout this period, city and state officials have received complaints from the Facility's neighbors about water pollution, significant dust pollution (which becomes water pollution when it rains, snows, or otherwise precipitates), and other nuisances caused by Defendants' industrial activities at the Facility.

8.      Baykeeper is filing suit against Defendants again because, since the last case was settled in 2019, Defendants have returned to their old ways.  Defendants are violating the terms of the prior settlement, their permit, and Sections 301 and 402 of the Clean Water Act.

9.      First, Defendants are violating multiple provisions of the General Permit, i.e., the permit that regulates Defendants' discharges of industrial stormwater to Coney Island Creek. Defendants' violations of the General Permit include not using the best available technology to prevent pollution; not developing thorough and accurate pollution prevention plans; and

violations of various recordkeeping, monitoring, and corrective action requirements of the General Permit.  Each violation of the General Permit is a violation of the Clean Water Act.

10.     Second, Defendants are discharging industrial stormwater to Coney Island Creek from areas and activities that are not covered under the General Permit.  Each discharge of industrial stormwater to Coney Island Creek without coverage under the General Permit is a violation of the Clean Water Act.

11.     Third, Defendants continue to discharge contaminated wastewater without a permit.  Defendants' coverage under the General Permit allows the discharge of stormwater only; it does not allow them to discharge wastewater from washing concrete trucks or other activities to Coney Island Creek.  Each unpermitted discharge of wastewater is also a separate violation of the Clean Water Act.

12.     In total, Defendants have accumulated more than 2,000 violations of the Clean Water Act since the prior lawsuit was settled and dismissed in 2019.

## II.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

14.     Jurisdiction is not barred by the prior settlement between the parties.  On November 9, 2018, Baykeeper provided noticed of Defendants' violations of the Clean Water

Act at multiple facilities, including the Facility identified in this lawsuit, and filed a citizen suit

on January 14, 2019. *See Raritan Baykeeper Inc. v. Stillwell Ready Mix, LLC*, No. 19-cv-256

(E.D.N.Y.). On July 30, 2019, the Eastern District of New York entered a Stipulation of

Settlement between Stillwell and Baykeeper. *Id.*, Electronic Order (E.D.N.Y. July 30, 2019)

(citing ECF 20-1) ("Settlement"). In that Settlement, as relevant here, Stillwell agreed to operate

the Facility in accordance with the General Permit, its Stormwater Pollution Prevention Plan

("SWPPP"), and the Clean Water Act. Settlement ¶ 2. Stillwell also specifically agreed to

"refrain from discharging process wastewater from the 13th Street facility," and "refrain from

engaging in truck washing at the 13th Street facility." Settlement ¶ 3 (the location identified as

"the 13th Street facility" in the prior litigation is referred to here simply as "the Facility"). In

consideration for those terms, Baykeeper agreed to dismiss and release all claims for violations

of the Clean Water Act occurring prior to July 30, 2019. Settlement ¶ 5. Baykeeper did not

waive or release claims for enforcement of that Settlement, nor did Baykeeper waive the right to

bring a future action based on violations of the Clean Water Act on or after July 30, 2019.

Settlement ¶¶ 5, 7.

15.     On April 30, 2021, Plaintiff provided notice of Defendants' continued violations

of the Clean Water Act and of its intention to again file suit to Defendants; the Administrator of

the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region

II; and the Commissioner of the New York Department of Environmental Conservation

("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A),

and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3. A true and correct copy of

Plaintiff's Notice Letter is attached as Exhibit A and is incorporated herein by reference.

16.     More than sixty days have passed since the Notice Letter was served on Defendants and the State and federal agencies.  Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

17.     Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

18.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

19.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.

## PARTIES

20.     Plaintiff RARITAN BAYKEEPER, INC., d/b/a "NY/NJ BAYKEEPER" ("Baykeeper"), is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary through enforcement, field work, and community action.  Baykeeper's mission includes safeguarding the environmental, recreational, and commercial integrity of the Raritan Bay, Lower Raritan River, the New York Harbor, Gravesend Bay, Coney Island Creek, and Jamaica Bay.  Baykeeper achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums.  To further its mission, Baykeeper actively seeks federal and state implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

21.     Baykeeper has approximately 350 members in the New York and New Jersey region, many of whom use and enjoy the waters and tributaries of the New York Harbor— including Coney Island Creek and Gravesend Bay, which are polluted by industrial stormwater runoff from the Defendants' Facility.

22.     Plaintiff's members reside near to, use, and enjoy the waters Defendants are polluting.  Plaintiff's members use those areas to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, study nature and the sciences, and engage in spiritual and religious practices, among other activities.  Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

23.     For example, one Baykeeper member frequently kayaks on Coney Island Creek, but avoids certain areas upstream of the Cropsey Avenue Bridge because of the pollutants that are in the water and further unknown contaminants from polluted discharges and storm sewer outlets.  They are worried by this pollution, and it has hindered their enjoyment of the Creek.  If Coney Island Creek were rehabilitated, they could kayak freely throughout the Creek.

24.     This member also enjoys observing and studying the wildlife of Coney Island Creek, and has participated in tagging and rescuing of horseshoe crabs.  They are concerned about the harm pollutants in the Creek cause to wildlife in the natural areas in their community.

25.     For example, another Baykeeper member, who is an active long-time resident of southern Brooklyn, pays close attention to the concerns of their community—including concerns surrounding Coney Island Creek.  They have actively participated in beach clean-ups, protests, and other political activities to bring attention to the pollution in Coney Island Creek and

encourage action by municipal, state, and federal leaders to clean up the Creek.

26.    This member has participated in scuba dives in Coney Island Creek specifically to draw attention to its pollution and to take samples from the sediment in the Creek bed.  They were warned by local officials not to dive in the Creek, as the waters may be dangerous to their health and safety due to high levels of pollution.  They took certain additional safety measures, at additional cost, to ensure their safety throughout the dive.  This member enjoys scuba diving for wildlife and shipwreck viewing, and their enjoyment of Coney Island Creek is hindered and endangered due to the pollution in the Creek.

27.    Both of these members of Baykeeper have observed people fishing in Coney Island Creek at Calvert Vaux Park and Kaiser Park, and fear for their community's safety because they know that Coney Island Creek is a polluted waterway and consuming the fish may cause the community harm.

28.    The relief sought herein will redress the harms to Plaintiff and its members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

29.    Baykeeper brings this action on behalf of itself and its members.  Baykeeper's interest in reducing Defendants' discharges of pollutants into Coney Island Creek and requiring Defendants to comply with the requirements of the General Permit are germane to Baykeeper's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Baykeeper.

30.    Baykeeper is informed and believes, and thereupon alleges, that Defendant STILLWELL READY MIX & BUILDING MATERIALS, LLC is a corporation incorporated

under the laws of the State of New York, that owns and/or operates the Facility.

31.     Baykeeper is informed and believes, and thereupon alleges, that Defendant STILLWELL READY MIX, LLC is a corporation incorporated under the laws of the State of New York, that owns and/or operates the Facility.

32.     Baykeeper is informed and believes, and thereupon alleges, that Defendant GERARD GARGANO is and was at all relevant times a citizen of the State of New York who is the corporate officer responsible for CWA compliance at the Facility and a member/manager for Defendants Stillwell Ready Mix & Building Materials, LLC and Stillwell Ready Mix, LLC.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

33.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

34.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  A NPDES permit requires dischargers of pollution to comply with various limitations.

35.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that

the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

36.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

37.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

38.     The Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard).  The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants."  *Id*. § 1311(b)(2)(E)[1] (i.e., the "BCT" standard) (together, the "BAT/BCT Standard").  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

39.     The Clean Water Act further requires any NPDES permit issued by a state to contain any additional limits necessary to ensure compliance with that state's water quality standards.  *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent

---

[1] "Conventional pollutants" are defined by statute, 33 U.S.C. § 1314(a)(4), and by regulation, 40 C.F.R. § 401.16, to include: biochemical oxygen demand, total suspended solids ("TSS"), pH, fecal coliform, and oil and grease.

limitation, including those necessary to meet water quality standards"), 1342(b)(1)(A) (requiring

compliance with "any applicable requirements" of 33 U.S.C. § 1311. *See also* 40 C.F.R.

§ 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve

a state's water quality standards).

40.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress

enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial

Stormwater Discharges."

41.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated

stormwater discharge regulations at 40 C.F.R. § 122.26.  In promulgating those regulations, EPA

cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and

coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities

contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater

runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment

plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

42.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26

require NPDES permits for stormwater discharges "associated with industrial activity."

**New York's General Permit for the Discharge**
**of Stormwater Associated with Industrial Activity**

43.     As a delegated state NPDES permitting agency, DEC has elected to issue a

statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector*

*General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-

0-17-004, N.Y. Dep't Envtl. Conservation (Mar. 1, 2018) ("General Permit").  DEC also has

the authority to issue individualized SPDES permits for such applicants.

44.     As a state-issued, delegated NPDES permit, the General Permit requires

permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the BAT/BCT Standard.  *See* General Permit, Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice").

45.     Furthermore, as a state-issued, delegated NPDES permit, the General Permit prohibits permittees from causing or contributing to violations of water quality standards.  *See* General Permit, Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705."); *Id.* Part II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

## The General Permit Framework

46.     The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the CWA's citizen suit provision.  33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

47.     At the outset, the General Permit establishes eligibility conditions that permittees must meet to obtain coverage.  General Permit, Part I.  Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent.  General Permit, Part I.D.

48.     Among other things, when submitting a Notice of Intent, the applicant must identify the specific outfalls through which it will discharge industrial stormwater.  A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls.

General Permit, Parts I.D.3, I.F.

49.     Next, the General Permit contains a variety of substantive limits that all permittees must meet.  General Permit, Part II.  These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and compulsory pollution control and minimization practices.  General Permit, Part II.

50.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  General Permit, Part VII.  Although permittees may have a primary industrial activity occurring at their site, they are required to comply with all conditions pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities.  *Id.*  ("Stormwater discharges from co-located industrial activities are authorized by this permit, provided that the owner or operator complies with any and all of the requirements applicable to each industrial activity at the facility.").

51.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  *See, e.g.*, General Permit, Part II (outlining mandatory BMPs), Part VII (outlining sector-specific BMPs), Part III.A.7 (requiring documentation of all BMPs installed and implemented at the facility pursuant to Parts II and VII,

documentation of all innovative BMPs, and an explanation of any BMPs that have not been installed due to site-specific conditions).

52.     A permittee must record the BMPs and control measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General Permit, Part III.  The permittee must develop, implement, and continually update this plan to adapt it to changing conditions at the facility.  *Id.*  The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit.  *Id.* Further, the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit—a fully implemented SWPPP is a precondition of coverage.  General Permit, Part I.D.1.a.

53.     To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must track, improve upon, and report upon their performance under the General Permit.  *See* General Permit, Parts IV–VII.

54.     The General Permit requires regular inspections by qualified personnel, including annual comprehensive inspections and quarterly routine inspections, to evaluate the performance and maintenance needs of BMPs, detect leaks, and document any deficiencies in the implementation and/or adequacy of the SWPPP, amongst other things.  General Permit, Parts IV.A–C; *see also id.* Parts II.A.2–3.

55.     The General Permit also requires monitoring of stormwater discharges, including quarterly visual monitoring and periodic sampling for pollutants associated with the facility's industrial sector.  General Permit, Parts IV.D–G, VII.  The General Permit relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (benchmarks) for each pollutant to ensure that permittees are minimizing

14

pollution and complying with the narrative limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

56.    A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

57.    Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), vacated on other grounds, 485 U.S. 931 (1988).

58.    If an inspection or monitoring sample reveals an exceedance, violation, or other issues with the BMPs or the SWPPP, the permittee is required to take and document corrective actions.  General Permit, Part V.

59.    The results of a permittee's inspections and monitoring must be documented and kept with the SWPPP, and certain reports must be submitted to DEC on a periodic basis. General Permit, Part VI.  This self-reporting is the primary means by which DEC and EPA ensure a facility complies with the General Permit and the Clean Water Act.

## Key Conditions of the General Permit

60.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case.

61.     First, discharges of non-stormwater are not authorized under the General Permit, with certain specific exceptions (such as fire control).  General Permit, Part I.C.  The General Permit only authorizes discharges of *stormwater* associated with industrial activity; to legally discharge non-stormwater to the waters of the United States, entities must seek an individual SPDES permit specifically authorizing such discharge.  General Permit, Parts I.B–C.  Permittees are also required to certify in their SWPPP that "all discharges have been tested or evaluated for the presence of non-stormwater discharges" and to describe the evaluation criteria or testing method used.  General Permit, Part III.A.7.

62.     Furthermore, as part of or in addition to the annual inspection, qualified personnel must annually conduct a dry-weather inspection of all outfalls to update the facility's non-stormwater discharge certification.  General Permit, Parts III.A.7.f, IV.C.  Ready-mix concrete facilities, such as the Facility operated by Defendants, are required to specifically describe measures that ensure that "process wastewater that results from washing of trucks, mixers, transport buckets, forms or other equipment are discharged in accordance with a separate SPDES permit or are recycled."  General Permit, Part VII.E, at 61.

63.     Second, as discussed above, the General Permit mandates that all permittees use certain BMPs to minimize the exposure of potential sources of pollution to stormwater to the greatest extent possible, so as to meet the federal BAT/BCT Standard.  General Permit, Part II.A.  As relevant here, these mandatory BMPs include: (1) minimizing the exposure of industrial areas to stormwater and stormwater runoff; (2) good housekeeping (e.g., sweeping regularly,

appropriate storage in closed containers, etc.); (3) minimize onsite erosion and sedimentation; (4) divert, contain, and otherwise reduce all stormwater discharges from the facility; (5) train all employees, at least annually, in appropriate stormwater control and SWPPP implementation; (6) eliminate non-stormwater discharges; and (7) "minimize generation of dust and off-site tracking of raw, final, or waste materials." General Permit, Parts II.A.1, 2, 5, 6, 8, 9, 11.

64.     In addition, facilities that participate in the production of concrete and cement are required to implement the BMPs outlined in Sector E of the General Permit. General Permit, Part VII.E (Glass, Clay, Cement, Concrete, and Gypsum Products). Amongst other things, Sector E imposes additional housekeeping requirements to "minimize the discharge of: Spilled cement; Aggregate (including sand or gravel); Kiln dust; Fly ash; Settled dust; and other significant materials in stormwater"; "prevent[] the exposure of fine granular solids (such as cement, kiln dust, etc.) to stormwater"; and storing the aforementioned materials, where practicable, in "enclosed silos or hoppers, buildings, or under other covering." General Permit, Part VII.E.General Permit, Part VII.E, at 62.

65.     Third, the General Permit provides detailed instructions to ensure the SWPPP "documents the practices and procedures [necessary] to ensure compliance with the conditions of th[e General Permit], including the selection, design, installation and maintenance of control measures selected to meet effluent limitations in Parts II and VII." General Permit, Part III. Amongst other things, an adequate SWPPP must identify and provide a detailed site map identifying the location of all industrial activities, potential sources of pollution, BMPs, and drainage; clearly outline spill prevention and response procedures; and describe, in detail, all procedures used to inspect for, minimize, and monitor stormwater discharges from the facility. General Permit, Part III.A.   The SWPPP must describe and ensure the implementation of

practices that minimize the discharge of pollutants in stormwater and that assure compliance

with the terms and conditions of the General Permit, including effluent limitations.  *Id.*

66.     In addition, Sector E imposes additional requirements on SWPPPs for facilities

that participate in the production of concrete, including additional requirements for the site map

(identification of dust control devices and devices used in the recycling of process wastewater)

and specific requirements regarding the frequency of sweeping or other measures utilized to

control dust at the facility.  General Permit, Part VII.E, at 61–62.

67.     Fourth, as discussed above, the General Permit requires permittees to conduct

regular inspections of the facility and monitoring of stormwater discharges to ensure the BMPs

and SWPPP are effectively minimizing the discharge of pollution through stormwater.  General

Permit, Part IV.  If deficiencies are identified, corrective actions must be taken and documented.

General Permit, Part V.  Reports of these procedures must be kept with the SWPPP, and certain

reports must be submitted to DEC.  General Permit, Part VI.

68.     Sector E imposes additional inspection requirements on facilities that participate

in the production of concrete, requiring that inspections take place while the facility is in

operation and must include the following, if exposed to stormwater: material handling areas,

aboveground storage tanks, hoppers or silos, dust collection and containment systems, truck

washing areas, and equipment cleaning areas.  General Permit, Part VII, at 61.

69.     Sector E also defines the benchmarks relevant to facilities that participate in the

production of concrete.  General Permit, Parts IV.D, IV.F, VII.E.  Sector E imposes benchmarks

of 100 mg/L for total suspended solids ("TSS"), pH of 6.0 to 9.0, and 1 mg/L for total

recoverable iron.  A ready-mix concrete facility, such as the Defendants' Facility, must sample

for these benchmarks and visually monitor discharges for any indication of pollution (e.g., color

and clarity; solids; foam or oily sheens; odor; or other indicators).  General Permit, Part IV.E.6.

70.     Fifth, any deficiencies identified through these inspections and monitoring procedures must then be addressed through corrective actions.  General Permit, Parts IV.A.1.b, IV.B.4, IV.C.3, IV.E.6, V.

71.     Sixth, the General Permit requires permittees to submit complete and accurate reports to DEC based on these inspections, monitoring, and corrective actions.  General Permit, Part VI.  Permittees are required to submit an Annual Certification Report ("ACR") following the annual inspection and Discharge Monitoring Reports ("DMRs") following periodic monitoring.  General Permit, Part VI.A.  This self-reporting regime is the primary mechanism through which DEC monitors industrial stormwater pollution in New York State.

72.     In addition to those submitted reports, all permittees are required to maintain reports and appropriate documentation with the SWPPP for all other inspection and monitoring activities, as well as for any corrective actions taken in response to any issues or exceedances, for at least five years.  General Permit, Part VI.B–C.

**Clean Water Act Citizen Enforcement Suits**

73.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

74.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA § 505(f), 33 U.S.C. § 1365(f).

75.     Declaratory relief in such cases is authorized by 28 U.S.C. §§ 2201–02 (granting

U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

76.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

77.     Violators of the Act are subject to an assessment of civil penalties of up to $56,460 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### The Facility and Stormwater

78.     Defendants own and/or operate the Facility, a concrete mixing and distribution facility located in Brooklyn, NY.  The Facility includes a ready-mix concrete plant, truck washing equipment, and outdoor material piles of sand, aggregate, stone, and other substances used in manufacturing, loading, and delivering ready-mix concrete.

79.     Industrial activities at the Facility are categorized within Standard Industrial Classification ("SIC") Code 3272 (Concrete Products, Except Block and Brick).  Activities in this SIC Code are subject to the General Permit's effluent limits for industrial Sector E.

80.     The Facility is located near Coney Island Creek.  Stormwater from the area drains without treatment to Coney Island Creek by way of the municipal separate storm sewer system (known as an "MS4").

81.     The Facility is immediately adjacent to West 13th Street and Avenue Z, which are both public roads.

82.     Baykeeper has observed Defendants routinely washing its concrete trucks in its driveway on West 13th Street, as well as on West 13th Street itself.  On information and belief,

this behavior is repeated multiple times per day every day the Facility operates.

83.     Baykeeper has observed this truck washwater drain from the driveways and West 13th Street to a catch basin on West 13th Street near the corner of Avenue Z.  The catch basin drains to the MS4, which discharges to Coney Island Creek.

84.     Baykeeper has observed Defendants regularly conduct loading and unloading operations directly on West 13th Street and Avenue Z.  On information and belief, this behavior is repeated multiple times per week every week the Facility operates—and in many cases, multiple times per day.

85.     Baykeeper has also observed Defendants' loading and unloading operations on West 13th Street and Avenue Z produce light-colored particulate matter that lands on the public thoroughfares.

86.     Baykeeper has observed pedestrians walk over and through Defendants' loading and unloading operations.  Baykeeper has also observed cars navigate around Defendants' loading and unloading operations, as well as their truck washing operations, on the public streets.

87.     Baykeeper has also observed light-colored particulate matter from Defendants' material stockpiles within the Facility get blown by the wind out of the Facility.

88.     The Facility produces prolific quantities of light-colored particulate matter.  This matter disperses from the Facility and covers surfaces in the neighborhood surrounding the Facility, including roads, sidewalks, cars, windows, doorways, buildings, and roofs.

89.     When it rains, the majority of stormwater from the Facility comes from, or is commingled with runoff from, areas at the Facility where industrial processes occur (including the roofs of Facility buildings).

90.     When it rains, stormwater from areas surrounding the Facility is contaminated by

light-colored particulate matter that originated from the Facility or from the Defendants'

industrial activities surrounding the Facility.

91.     Baykeeper has observed stormwater flowing from areas surrounding the Facility

to be visibly contaminated by light-colored particulate matter.

92.     Stormwater flowing over areas of the Facility and areas surrounding the Facility

that are associated with Defendants' industrial activities collects a variety of pollutants, including

but not limited to sediment and suspended solids, pH-altering contaminants, oxygen-depleting

chemicals, metals such as iron, oil and grease, and other pollutants.

93.     Stormwater discharged from the Facility flows directly into the MS4, which flows

without treatment into Coney Island Creek, which flows on to Gravesend Bay, New York

Harbor, and then to the Atlantic Ocean.

94.     Coney Island Creek, Gravesend Bay, New York Harbor, and the Atlantic Ocean

are waters of the United States.

## **Defendants' General Permit Coverage**

95.     Defendants have applied for and obtained coverage under the General Permit.

Defendants' General Permit identification number is NYR00G222.

96.     Under the General Permit, Defendants are authorized to discharge stormwater into

waters of the United States through the three outfalls Defendants identified in their Notice of

Intent and in their SWPPP dated January 4th, 2019: 1) the north side of the east driveway, 2) the

center of the north driveway, and 3) the center of the west driveway. These outfalls are

designated DSN001, DSN002, and DSN003, respectively.  Under the General Permit,

Defendants are not authorized to discharge non-stormwater, including truck washwater.

## **Defendants' Unpermitted Discharges**

97.     On information and belief, Defendants discharge stormwater associated with industrial activity from other, unpermitted outfalls during precipitation events.  At least two such outfalls exist.  The eastern side of the Facility has two driveways.  Of these two, Defendants have only identified the north side of the northernmost driveway as an outfall.  However, Baykeeper has observed an unpermitted outfall between these two driveways and a second unpermitted outfall on the on the southern edge of the south driveway.

98.     Baykeeper is informed and believes, and thereupon alleges, that Defendants have not identified all outfalls from the Facility and are discharging stormwater associated with industrial activity from the Facility without authorization under any permit in violation of the General Permit and the Clean Water Act.

99.     In addition, Defendants are utilizing public thoroughfares to conduct industrial activities.  Defendants are discharging stormwater associated with these industrial activities to the MS4, and from there to Coney Island Creek, without authorization under any permit and in violation of the Clean Water Act.

100.     Further, Defendants are discharging process wastewater from truck washing, both from the Facility's driveways and from West 13th Street itself.  Defendants are discharging non-stormwater to the MS4, and from there to Coney Island Creek, without authorization under any permit and in violation of the Clean Water Act.

101.     Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

## Defendants' Inadequate Stormwater Pollution Prevention Plans

102.    As discussed above, the General Permit requires permittees, including

Defendants, to develop and implement an adequate Stormwater Pollution Prevention Plan

("SWPPP") that meets certain requirements and describes the best management practices

("BMPs") being used on-site to minimize the exposure of pollution to stormwater.

103.    On information and belief, Defendants have not implemented an adequate

SWPPP for the Facility.  Baykeeper is informed and believes, and thereupon alleges, that the

SWPPP does not contain an accurate site description and map, including identifying all

stormwater flow paths and discharge locations to surface waters or MS4 drains, such as the

locations of the unpermitted outfalls identified above.

104.    In addition, Baykeeper is informed and believes, and thereupon alleges, that the

SWPPP prepared for the Facility does not set forth adequate site-specific BMPs equivalent to the

BAT/BCT Standard for the Facility and necessary to meet the General Permit's requirement to

minimize pollutant discharges.

105.    Further detailed facts, including additional detail on specific incidents and

conditions that constitute violations of the General Permit, are set forth in the Notice Letter

attached hereto as Exhibit A, and are incorporated herein by reference.

106.    In the Notice Letter attached hereto as Exhibit A, sent on April 30, 2021,

Baykeeper requested a copy of Defendants' most recent SWPPP.

107.    The General Permit requires permittees to provide a copy of the SWPPP within

14 days of a written request.  General Permit, Part III.C.2.

108.    As of the filing of this complaint, Baykeeper has not received a copy of

Defendants' most recent SWPPP.

## Defendants' Inadequate Stormwater and Pollution Management Practices

109.    On information and belief, Baykeeper alleges that Defendants have failed and are continuing to fail to implement pollution controls equivalent to the BAT/BCT Standard at the Facility for its discharges of industrial stormwater containing oxygen-depleting chemicals, pH-altering chemicals, iron, TSS and particulate matter, and other pollutants.   The Facility has failed to implement adequate BMPs; management practices at the Facility are inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.

110.    Furthermore, Baykeeper is informed and believes, and thereupon alleges, that Defendants have failed to implement the following generally-applicable mandatory BMPs in violation of the General Permit: (1) minimizing the exposure of industrial areas to stormwater and stormwater runoff; (2) good housekeeping (e.g., sweeping regularly, appropriate storage in closed containers, etc.); (3) minimize onsite erosion and sedimentation; (4) divert, contain, and otherwise reduce all stormwater discharges from the facility; (5) train all employees, at least annually, in appropriate stormwater control and SWPPP implementation; (6) eliminate non-stormwater discharges; and (7) "minimize generation of dust and off-site tracking of raw, final, or waste materials."  General Permit, Parts II.A.1, 2, 5, 6, 8, 9, 11.

111.    On top of those generally-applicable BMPs, Baykeeper is also informed and believes, and thereupon alleges, that Defendants have failed to implement the following sector-specific BMPs in violation of the General Permit: (1) to "minimize the discharge of: Spilled cement; Aggregate (including sand or gravel); Kiln dust; Fly ash; Settled dust; and other significant materials in stormwater"; (2) to "prevent[] the exposure of fine granular solids (such as cement, kiln dust, etc.) to stormwater"; (3) to store the aforementioned materials, where practicable, in "enclosed silos or hoppers, buildings, or under other covering"; and (4) to ensure

that "process wastewater that results from washing of trucks, mixers, transport buckets, forms or other equipment are discharged in accordance with a separate SPDES permit or are recycled." General Permit, Part VII.E, at 61–62.

112.    The failure to implement sufficient BMPs and an adequate SWPPP is evidenced by, amongst other things, the unauthorized discharges of stormwater and process wastewater identified above, by the pervasive particulate contamination of the areas surrounding the Facility, and by the visibly contaminated stormwater discharges flowing from the Facility and the surrounding area to the MS4 and the waters of the United States.

113.    Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

**Defendants' Inadequate Monitoring, Inspection, and Reporting Practices**

114.    As discussed above, the General Permit requires permittees, including Defendants, to conduct regular inspections of stormwater controls, to monitor stormwater discharges, and to take corrective action where the Facility's BMPs and SWPPP are deemed insufficient to minimize the exposure of stormwater to pollution.  Defendants are also required to submit certain reports of these inspection and monitoring procedures to DEC, and to keep all appropriate documentation of these procedures with the SWPPP for five years.

115.    Since obtaining General Permit coverage on February 15, 2019, Defendants have been required to submit two Annual Comprehensive Reports ("ACRs") to DEC.  Baykeeper is informed and believes, and thereupon alleges that, as of the filing of this Complaint, Defendants have not submitted either Annual Comprehensive Report.

116.    Since obtaining General Permit coverage on February 15, 2019, Defendants have

been required to submit five periodic Discharge Monitoring Reports ("DMRs").  In all of these DMRs, Defendants reported "no discharge" from the Facility.  Given data regarding precipitation during those periods, *see* Exhibit A at 18–24, Baykeeper believes and thereupon alleges that qualifying storm events producing a discharge from the Facility occurred during those periods. Baykeeper therefore alleges Defendants have failed submit accurate DMRs to DEC.

117.    Since obtaining General Permit coverage on February 15, 2019, Defendants have been required to perform the following inspection and monitoring activities at the Facility: (1) two annual comprehensive inspections; (2) two annual dry weather inspections for detection of non-stormwater discharges; (3) eleven quarterly routine inspections; (4) eleven quarterly visual monitoring of stormwater discharges; and (5) five semi-annual monitoring of benchmarks from stormwater discharges.  General Permit, Part IV.

118.    On information and belief, Defendants have failed to conduct any of the required inspections and monitoring—or, alternatively, have conducted such sub-par inspections as to fail to meet the minimum requirements outlined by the General Permit.  These failures are evidenced by Defendants' failure to submit ACRs to DEC, by Defendants' failure to make accurate reports to DEC in their DMRs, by their unauthorized discharges of process wastewater, by their unauthorized discharges of stormwater, by the pervasive particulate contamination of the areas surrounding the Facility, and by the visibly contaminated stormwater discharges flowing from the Facility and the surrounding area to the MS4 and the waters of the United States.

119.    In addition to their failure to adequately inspect, monitor, and report on conditions at the Facility, Defendants have not monitored or reported discharges from their industrial activities taking place on public streets surrounding the Facility.  Defendants have failed to monitor stormwater discharges associated with their industrial activities occurring on West 13th

Street and Avenue Z for the benchmarks associated with Sector E.

120.     Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

**Stormwater Associated with Industrial Activity and
Process Wastewater is Discharged from the Facility**

121.     As a result of the above practices, stormwater associated with Defendants' industrial activities discharges from the Facility and the areas surrounding the Facility into the MS4, which discharges to Coney Island Creek and flows from there to Gravesend Bay, New York Harbor, and the Atlantic Ocean.

122.     On information and belief, Baykeeper alleges that all of the events and circumstances described above have occurred continuously since at least July 30, 2019.

123.     Information available to Baykeeper indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of stormwater associated with industrial activity and process wastewater. Baykeeper is informed and believes, and thereupon alleges, that all violations alleged in this Complaint are ongoing and continuous.

124.     Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### Unlawful Discharge of Non-Stormwater
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

125.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

126.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

127.    The General Permit applicable to Stillwell does not authorize discharges of non-stormwater, including wastewater from washing vehicles.  General Permit, Part I.C.

128.    Baykeeper is informed and believes, and thereupon alleges, that Defendants do not have an individual SPDES permit authorizing discharges of such process wastewater to the waters of the United States.

129.    Defendants routinely wash their trucks is such manner and location that washwater from the Facility drains into an MS4, which in turn flows into Coney Island Creek. Defendants thereby discharge non-stormwater without authorization into Coney Island Creek.

130.    Defendants also regularly wash concrete trucks directly on West 13th Street.

131.    On information and belief, Defendants have discharged and continue to discharge such process wastewater on each and every day it has operated since at least July 30, 2019.

132.    Each of these unauthorized discharges of non-stormwater constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These

violations are ongoing and continuous.

## SECOND CAUSE OF ACTION
**Unlawful Discharge of Stormwater Associated with Industrial Activity
from Public Roads and Areas External to the Facility
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

133.     Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

134.     CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

135.     Defendants routinely conduct loading and unloading operations on West 13th Street and Avenue Z, which are public roads.

136.     Defendants' industrial activities occurring outside the Facility are exposed to stormwater, with no BMPs or SWPPP in place to manage such exposure.

137.     These industrial activities also expose neighbors, pedestrians, passing cars, and the surrounding neighborhood to substantial quantities of dust and other pollutants.  Neighbors, pedestrians, and passing cars in turn track these pollutants to other areas, where they are exposed to stormwater.

138.     Defendants lack any kind of permit coverage for discharges of stormwater from their industrial activities occurring outside the Facility on West 13th Street and Avenue Z.

139.     Stormwater exposed to Defendants' industrial activities occurring outside the Facility flow into the MS4, and from there to Coney Island Creek.  Defendants thereby discharge stormwater associated with industrial activity without authorization into Coney Island Creek.

140.     On information and belief, Defendants have discharged and continue to discharge

stormwater associated with industrial activity from areas external to the Facility on each and every day there has been greater than 0.1 inches of precipitation since at least July 30, 2019.

141.    Each of these unauthorized discharges of stormwater constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

**THIRD CAUSE OF ACTION**
**Unlawful Discharge of Stormwater Associated with Industrial Activity**
**from Unauthorized Outfalls at the Facility**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

142.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

143.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. §1342.

144.    Defendants are only authorized to discharge stormwater through three specific outfalls, as identified in their Notice of Intent and SWPPP.

145.    On information and belief, Defendants have discharged and continue to discharge stormwater associated with industrial activity from multiple unpermitted outfalls at the Facility on each and every day there has been at least 1 inch of precipitation since at least July 30, 2019.

146.    Every day on which Defendants discharge stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

### FOURTH CAUSE OF ACTION
**Failure to Implement the Best Available and Best Conventional Treatment Technologies**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

147.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

148.    The General Permit, Parts II.D, requires Defendants to implement mandatory generally applicable pollution control measures and BMPs to minimize the discharge of pollutants from the Facility.

149.    Because the industrial activities carried out at the Facility are categorized in SIC Code 3272, Defendants must also implement the mandatory sector-specific control measures specified in Part VII of the General Permit for Sector E.

150.    Baykeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or the mandatory BMPs required by the General Permit.

151.    The pollution prevention and control measures selected to comply with Parts II.D and VII.E of the General Permit must meet the federal BAT/BCT Standard.

152.    Defendants have failed to implement control measures that meet the BAT/BCT Standards at the Facility for its discharges of stormwater associated with industrial activity containing iron, pH-altering substances, oxygen-demanding substances, suspended solids, and other pollutants, in violation of Parts II and VII of the General Permit.

153.    The failure to implement sufficient BMPs that meet the BAT/BCT Standard is evidenced by, amongst other things, the unauthorized discharges of stormwater and process wastewater identified above, by the pervasive particulate contamination of the areas surrounding the Facility, and by the visibly contaminated stormwater discharges flowing from the Facility and the surrounding area to the MS4 and the waters of the United States.

154.     On information and belief, Defendants have failed to develop and implement pollution controls equivalent to the BAT/BCT Standard every day since at least July 30, 2019.

155.     Each day upon which Defendants operate the Facility without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
**Failure to Develop, Implement, and Maintain an Adequate SWPPP
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

156.     Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

157.     Part III of the General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

158.     As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

159.     Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

160.     The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VII.E of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies. Each of these elements also require the discharger to maintain records and documentation of

compliance with each of these elements.

161.    The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

162.    Defendants have failed to develop, implement, and keep up to date an adequate SWPPP for the Facility.  The inadequacy of the SWPPP is evidenced by, inter alia, the unauthorized discharges of stormwater and process wastewater identified above, the inadequate stormwater control measures and BMPs at the Facility identified above, the pervasive particulate contamination of the areas surrounding the Facility, and the visibly contaminated stormwater discharges flowing from the Facility and the area surrounding the Facility to the MS4 and the waters of the United States.

163.    On information and belief, Defendants have failed to develop and implement an adequate SWPPP for the Facility every day since at least July 30, 2019.

164.    Each day upon which Defendants operate the Facility without an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

**SIXTH CAUSE OF ACTION**
**Failure to Provide a Copy of the Stormwater Pollution Prevention Plan**
**(Violation of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

165.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

166.    In the Notice Letter attached hereto as Exhibit A, sent on April 30, 2021, Baykeeper requested a copy of Defendants' most recent SWPPP.

167.    The General Permit requires permittees to provide a copy of the SWPPP within 14 days of a written request.  General Permit, Part III.C.2.

168.    As of the filing of this complaint, Baykeeper has not received a copy of

Defendants' most recent SWPPP.

169.    Defendants have been in violation of this requirement of the General Permit every

day since May 14, 2021.  Defendants continue to be in violation of this requirement each day

that it fails to provide a copy of its updated SWPPP.

170.    Each day upon which Defendants fail to provide a copy of their updated SWPPP

for the Facility is a separate and distinct violation of the General Permit and CWA Sections

301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## SEVENTH CAUSE OF ACTION
### Failure to Conduct Routine Inspections and Monitoring
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

171.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set

forth herein.

172.    The General Permit requires facility operators to implement inspection and

monitoring procedures that will allow facility operators to determine whether they have

adequately minimized the level of pollutants in stormwater runoff through the development and

proper implementation of the facility's SWPPP, including annual and quarterly inspections of the

covered facility, quarterly visual monitoring of stormwater discharges, semi-annual benchmark

monitoring of stormwater discharges, and annual dry-weather inspections of the covered facility

to look for non-stormwater discharges.

173.    On information and belief, Defendants have failed to conduct adequate annual

comprehensive inspections, dry weather inspections, or quarterly routine site inspections of the

Facility since at least July 30, 2019.

174.    On information and belief, Defendants have failed to conduct adequate

monitoring of stormwater discharges from the Facility, or from areas surrounding the Facility, since at least July 30, 2019.

175.    The failure to conduct adequate inspections and monitoring is evidenced by Defendants clear, repeated violations of the General Permit and Clean Water Act, including the unauthorized discharges of stormwater and process wastewater identified above, by the pervasive particulate contamination of the areas surrounding the Facility, and by the visibly contaminated stormwater discharges flowing from the Facility and the surrounding area to the MS4 and the waters of the United States.

176.    Each and every day on which Defendants fail to comply with any of the General Permit's inspection and monitoring requirements is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

**EIGHTH CAUSE OF ACTION**
**Failure to Take Corrective Actions**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

177.    Baykeeper re-alleges and incorporates all preceding paragraphs as fully set forth herein.

178.    Under the General Permit, when a permittee learns of an effluent limit violation, said permittee must document such behavior and take corrective actions.  General Permit, Parts IV.A.1.b, IV.B.4, IV.C.3, IV.E.6, V.

179.    Documentation of such violation must record the issue causing this violation, the date said issue was discovered, and the corrective action being taken, amongst other things. General Permit, Part V.C (citing Appx H.8).

180.    These corrective and documentary requirements also apply to the discovery of

non-stormwater discharges.  General Permit, Part V.B.

181.    Baykeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not taken adequate corrective actions to address their ongoing violations since at least July 30, 2019.  This failure is evidenced by Defendants clear, repeated violations of the General Permit and Clean Water Act, including the unauthorized discharges of stormwater and process wastewater identified above, by the pervasive particulate contamination of the areas surrounding the Facility, and by the visibly contaminated stormwater discharges flowing from the Facility and the surrounding area to the MS4 and the waters of the United States.

182.    Each and every day on which Defendants fail to comply with any of the General Permit's corrective action requirements is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## NINTH CAUSE OF ACTION
### Failure to Record and Make Accurate Reports
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

183.    Baykeeper re-alleges and incorporates all preceding paragraphs as fully set forth herein.

184.    Under the General Permit, Defendants must inspect the Facility, monitor discharges, and accurately report their findings to DEC and/or maintain a record of their findings with their SWPPP.  General Permit, Parts IV, VI, Apps. H.8.g, H.9.  This includes submitting Annual Comprehensive Reports and Periodic Discharge Monitoring Reports to DEC.  General Permit, Parts VI.A.1, 2.

185.    Baykeeper is informed and believes, and thereupon alleges that, as of the filing of

this Complaint, Defendants have not submitted Annual Comprehensive Reports to DEC since at least July 30, 2019.

186.    Baykeeper further alleges that Defendants have failed to accurately report their discharges in their periodic Discharge Monitoring Reports to DEC since at least July 30, 2019.

187.    In addition, as Defendants are continuing to engage in clear, repeated violations of the Act, Baykeeper believes and alleges that, since at least July 30, 2019, Defendant have not and are not monitoring and inspecting their activities as required and are therefore failing to maintain accurate documentation of their monitoring and inspection activities with the SWPPP.

188.    Furthermore, Defendants are failing to monitor the areas outside of the Facility for benchmarks associated with industrial activities under Sector E.

189.    Each and every day on which Defendants fail to comply with any of the General Permit's reporting and recordkeeping requirements is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## VII.

## PRAYER FOR RELIEF

190.    Wherefore, Baykeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.    Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.    Enjoin Defendants from discharging non-stormwater from the Facility except as authorized by and in compliance with a NPDES permit;

c.      Enjoin Defendants from discharging stormwater from the Facility except as authorized by and in compliance with the General Permit;

d.      Enjoin Defendants from conducting industrial activities outside of their Facility, including but not limited to West 13th Street and Avenue Z;

e.      Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

f.      Order Defendants to immediately implement stormwater pollution control and treatment technologies and measures that are equivalent with the BAT/BCT Standard;

g.      Order Defendants to comply with the General Permit's inspection, monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations to create an adequate monitoring record;

h.      Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP in accordance with current site conditions;

i.      Order Defendants to provide Baykeeper with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and this Court's orders;

j.      Order Defendants to pay civil penalties for their numerous and repeated violations of the General Permit and the Clean Water Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1–19.4;

k.      Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

l.       Order Defendants to pay the costs of litigation, including Baykeeper's reasonable

investigative costs, attorney fees, expert witness and consultant fees, and other costs,

pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

m.      Award any such other and further relief as this Court may deem appropriate.

Dated this 22nd day of September, 2021          Respectfully submitted,
New York, New York


By:  _Julia Muench_____

Julia Muench
Edan Rotenberg

SUPER LAW GROUP, LLC
110 Wall Street
New York, NY 10005
*Attorneys for Baykeeper*